**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0131n.06

No. 19-1252

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

<table>
<tr><td>SHAWN LARALE BRYANT,<br><br>    Petitioner-Appellant,<br><br>v.<br><br>PATRICK WARREN, Warden,<br><br>    Respondent-Appellee.</td><td>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN</td></tr>
</table>

BEFORE: GRIFFIN, WHITE, and NALBANDIAN, Circuit Judges.

GRIFFIN, Circuit Judge.

A jury concluded petitioner Shawn Bryant trafficked heroin and cocaine while possessing a firearm. It was later discovered that one of the detectives who investigated and arrested Bryant lied under oath in an unrelated drug case. That lie begot two consequences: The detective lost his job and Bryant sought a new trial due to the misconduct[1] (along with an alleged speedy-trial delay). The Michigan Court of Appeals concluded this newly discovered impeachment evidence would not make a different result probable on retrial and that the trial delay did not prejudice Bryant. The district court found these conclusions to be reasonable under deference mandated by the Antiterrorism and Effective Death Penalty Act of 1996. We agree and affirm.

---

[1]The detective's misconduct has led to several other post-conviction matters and civil litigation. *See, e.g.*, *Kelley v. Burton*, — F. App'x —, 2020 WL 591407 (6th Cir. 2020); *Sanders v. Oakland Cty.*, 705 F. App'x 452 (6th Cir. 2017); *Kelley v. Ferguson*, 2015 WL 1510384 (E.D. Mich. March 24, 2015); *People v. Wright*, 2014 WL 265522 (Mich. Ct. App. Jan. 23, 2014).

I.

"The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Those are as follows:

> The facts leading to the convictions arose out of a raid conducted on October 29, 2009, at about 7:30 p.m., when the Oakland County Narcotics Enforcement Team (Team) executed a search warrant for apartments 13 and 21 at Maynard Court in Pontiac. Defendant was the target of the investigation that resulted in the warrants because on that day, and the day prior, Detective Marc Ferguson saw defendant at apartment 13 and the Team conducted two controlled buys from defendant.
>
> About a minute or two before, the rest of the Team entered the front door of apartment 13, Officer Jeff Fletemier and Sergeant Brent Miles went to the back of the apartment building to watch the rear exterior of apartment 13. The back of apartment 13 had a shared balcony with apartment 15 next door. Below the balcony were a concrete patio and a grassy yard. The balcony had a three to four foot high dividing wall that separated apartment 13's side of the balcony from apartment 15's side of the balcony. Officer Fletemier and Sergeant Miles looked around the area before they decided the best position to watch the back door leading out of apartment 13 onto the balcony. At this time, they did not see any contraband on the patio or in the yard. Officer Fletemier was standing in the yard about 10 feet from the balcony while Sergeant Miles was standing about five feet away from the balcony.
>
> While the rest of the team was entering apartment 13 through the open front door, Officer Fletemier and Sergeant Miles saw defendant open apartment 13's back door. Defendant stepped outside onto the balcony. The lights were on in the apartment and Officer Fletemier had his flashlight focused on the back door. Officer Fletemier and Sergeant Miles both shouted for defendant to stop and put up his hands. Instead, defendant raised his right arm and tossed a gun over the side balcony wall to the concrete patio below. In particular, although Officer Fletemier could not identify the object that defendant threw as a gun at the time defendant threw it, he did describe it as a "silver object" that made "a loud metal noise" when it hit the concrete patio. Sergeant Miles identified the object thrown as a gun; however, he could not identify defendant as the person on the balcony.
>
> Defendant subsequently tossed two packages of heroin, and then ducked down beneath the balcony wall. The officers lost sight of defendant for a bit, but then saw defendant roll or jump over the dividing wall onto apartment 15's side of the balcony. Defendant popped his head up over the balcony wall several times.

> Officer Fletemier and Sergeant Miles called Detective Ferguson to inform him about defendant's presence on the balcony. Detective Ferguson and Sergeant Giolitti came from the inside of the apartment to the balcony, hopped over the dividing wall, and arrested defendant on apartment 15's side of the balcony. Detective Ferguson found $3,600 in defendant's pocket. Officer Fletemier and Sergeant Miles then searched the area below the balcony and discovered a .45 caliber, loaded silver handgun. Within a couple of feet of the gun the officers located a broken open bag with a chunk of heroin in it and, in the yard just off the patio another chunk of heroin.

> With the help of several other officers, Sergeant Miles and Detective Ferguson searched apartment 13. In the living room, the officers found about nine grams of heroin, three grams of marijuana, a digital scale, three cell phones (one of which defendant allegedly identified as his own cell phone), several pictures of defendant, and defendant's car keys on a table. On the kitchen table there was approximately 47 grams of crack cocaine, 21 grams of heroin, 70 grams of powder cocaine, seven grams of marijuana, a digital scale, cutting agents, packaging materials, cash, and four cell phones.

*People v. Bryant*, 2014 WL 4214849, at *1–2 (Mich. Ct. App. Aug. 26, 2014) (per curiam) (footnotes omitted). A Michigan jury subsequently convicted petitioner of two counts of possession with the intent to deliver 50 to 449 grams of narcotics, in violation of MCL § 333.7401(2)(a)(iii), and two counts of possession of a firearm during the commission of a felony, in violation of MCL § 750.227b. *Id.* at *1.

News reports then surfaced concerning Detective Ferguson's conduct in a criminal case not involving Bryant. Specifically, it was reported that the detective had conducted a warrantless search of a shipping container holding nearly one hundred pounds of marijuana, resealed the container, requested a search warrant from a magistrate, and then testified during a preliminary hearing that he did not open the container before obtaining a warrant. Oakland County fired Ferguson. The Oakland County Prosecutor's Office reviewed about one hundred then-active cases in which Ferguson was involved, and ultimately dismissed sixteen cases that it concluded it could not prosecute without Ferguson's involvement.

Bryant's direct appeal was pending at the time. So the Michigan Court of Appeals remanded Bryant's appeal to the trial court to allow him to move for a new trial based on this newly discovered evidence, which the trial court granted. The Michigan Court of Appeals then considered both Bryant's direct appeal of his convictions and sentences and the prosecution's appeal of the new-trial grant. As relevant here, a majority of the panel concluded the trial court erroneously granted a new trial because Ferguson's misconduct would not have made a different result probable given other evidence admitted against Bryant. *Id.* at *11–13. And the panel unanimously found meritless Bryant's speedy-trial claim because the nineteen-month delay between his arrest and trial did not prejudice Bryant's defense. *Id.* at *7–8. The Michigan Supreme Court denied Bryant's application for leave to appeal, *People v. Bryant*, 864 N.W.2d 142, *reconsideration denied*, 868 N.W.2d 617 (Mich. 2015), and the district court denied Bryant's petition for a writ of habeas corpus on these claims,[2] *Bryant v. Haas*, 2019 WL 559674, at *1 (E.D. Mich. Feb. 12, 2019).

II.

Under the Antiterrorism and Effective Death Penalty Act of 1996, we may only overturn a state conviction for an issue adjudicated on the merits if it: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "was based on an unreasonable determination of the facts in light of the evidence presented" to the state court. 28 U.S.C. § 2254(d). The parties (and we) agree that the Michigan Court of Appeals decided Bryant's claims on the merits. And they (and we) agree Bryant's claim for habeas relief hinges upon § 2254(d)(1)'s "unreasonable application" provision.

---

[2]The district court granted a certificate of appealability on two of nine claims presented in Bryant's petition, the two we address here. It declined to issue a certificate of appealability on the other issues, and we denied his application to expand the certificate of appealability.

A claim for habeas relief based on § 2254(d)(1) must show more than that the state court's ruling was merely incorrect—"an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation omitted). Rather, the state court's decision "must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (citation omitted). That is to say the ruling "was so lacking that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "This is a difficult to meet[ ] and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted). And this threshold is highest when the legal standard at issue is "general" in nature because there is "greater . . . potential for reasoned disagreement among fair-minded judges." *Renico v. Lett*, 559 U.S. 766, 767 (2010). "We review the district court's legal conclusions in habeas proceedings de novo and its findings of fact for clear error." *Braxton v. Gansheimer*, 561 F.3d 453, 457 (6th Cir. 2009).

III.

Petitioner contends the Michigan Court of Appeals unreasonably concluded he was not entitled to a new trial in light of Ferguson's misconduct in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Like the district court, we disagree.

A *Brady* violation occurs when a prosecutor suppresses "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. "Evidence qualifies as material when there is any reasonable likelihood it could have affected the judgment of the jury." *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016) (per curiam) (internal quotation marks omitted). This includes not only

exculpatory evidence, but also evidence undermining witness credibility, *see Giglio v. United States*, 405 U.S. 150, 153–54 (1972), such as impeachment evidence, *see United States v. Bagley*, 473 U.S. 667, 676 (1985). And a *Brady* violation "occurs when the government fails to turn over even evidence that is known only to police investigators and not to the prosecutor." *Youngblood v. West Virginia*, 547 U.S. 867, 869–70 (2006) (internal quotation marks omitted). That is, "*Brady* obliges a police officer to disclose material exculpatory evidence" to the prosecutor, and "imposes upon prosecutors a duty to learn of any favorable evidence known to the others acting on the government's behalf, including the police." *D'Ambrosio v. Marino*, 747 F.3d 378, 389–90 (6th Cir. 2014) (brackets and internal quotation marks omitted).

A defendant need not show that the suppressed evidence would have made acquittal "more likely than not." *Wearry*, 136 S. Ct. at 1006 (citation omitted). Rather, "[h]e must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Id.* (citation omitted). "This is lower than the more-probable-than-not standard, but the difference between the two is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable." *LaMar v. Houk*, 798 F.3d 405, 416 (6th Cir. 2015) (internal quotation marks omitted). In impeachment cases, this can mean showing the prosecution's other evidence was not "strong enough to sustain confidence in the verdict" irrespective of the impeachment evidence. *Smith v. Cain*, 565 U.S. 73, 76 (2012) (evidence was material because the to-be-impeached witness "was the *only* evidence linking [the defendant] to the crime" and the suppressed statements "directly contradict[ed] his testimony"); *Harris v. Lafler*, 553 F.3d 1028, 1034 (6th Cir. 2009) ("Considerable authority from the Supreme Court and our court indicates that a defendant suffers prejudice from the withholding of favorable impeachment evidence when the prosecution's case hinges on the testimony of one witness." (collecting authority)).

In rejecting Bryant's claim that Ferguson's misconduct merited a new trial, the Michigan Court of Appeals focused on the limited-if-any role Ferguson played at trial because "the other officers' testimony supported [his] convictions":

> Acceptance of the veracity of the impeachment evidence would shed no light on whether defendant was the individual seen (tying their testimony together) by Officer Fletemier or Sergeant Miles throwing the gun and drugs off the porch of apartment 13, or to what these and other officers (in conjunction with Detective Ferguson) saw when searching apartment 13. Not only does the evidence itself have no exculpatory value, but even if its use caused the jury to disbelieve Ferguson's testimony, it would not be exculpatory because Ferguson never testified about defendant's actions that led to his convictions.

> * * *

> The newly discovered impeachment evidence offered by defendant is not sufficient to grant a new trial where the prosecution's case was supported by other witnesses. As we just noted, the trial testimony of Officer Fletemier and Sergeant Miles supported defendant's convictions. Their combined testimony established that defendant exited apartment 13, threw the gun and heroin over the balcony, and went over the wall to the balcony of apartment 15, as well as the weight of the heroin and cocaine found inside and outside the apartment.

*Bryant*, 2014 WL 4214849, at *11–12 (internal citations omitted).

This reasoning is imminently reasonable, for the prosecution's case did not "hinge[ ]" on Ferguson's testimony. *Harris*, 553 F.3d at 1034. "[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict." *Cain*, 565 U.S. at 76. Given other law enforcement officials' testimony, that is exactly what we have here. Fletemier and Miles observed Bryant exit apartment 13's back door, discard a weapon and drugs over the balcony, and move to apartment 15's balcony. And Miles participated in the search of apartment 13, which yielded the heroin, cocaine, and other drug-trafficking evidence that provided the factual basis for Bryant's drug trafficking convictions. With this evidence in hand, the Michigan Court of Appeals' ruling was not "so lacking that there was an error well understood

and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Echoing the conclusion of the dissenting judge, Bryant suggests impeachment of Ferguson would have tainted *all* of the testimony by law enforcement officials. *See Bryant*, 2014 WL 4214849, at *14 (Jansen, J., dissenting). But the Michigan Court of Appeals reasonably rejected this impeachment-by-association argument as conjecture: "[T]here is no evidence that other officers lied or covered for Detective Ferguson in the other case, or that any others did so in this case. Accordingly, the impeachment evidence regarding Detective Ferguson would not reasonably lead the trier of fact to disbelieve Officer Fletemier or Sergeant Miles." *Id.* at *12 (majority op.). The same goes for its response to Bryant's contention that Ferguson's misconduct raises concerns about the search warrant Ferguson obtained to search apartment 13:

> [T]here was nothing presented by defendant . . . to suggest in the slightest that Detective Ferguson lied in the search warrant affidavit in this case. Defendant has not brought forward any evidence that the search warrant contained any falsehoods. Absent *any* such evidence, the "presumption of validity cannot be overcome by defendant's self-interested inferences and conclusionary statements" about Ferguson's potential to have lied in the affidavit because he had lied once before.

*Id.* at *13 (citation omitted). These conclusions fit well-within *Brady*-prejudice principles. *See Hill v. Mitchell*, 842 F.3d 910, 926–27 (6th Cir. 2016) ("Speculation about a different outcome is not enough; the likelihood of a different result must be substantial, not just conceivable." (brackets, citation, and internal quotation marks omitted)).

The district court therefore correctly concluded Bryant was not entitled to a writ of habeas corpus for his *Brady* claim based on Ferguson's misconduct.

IV.

Bryant's other claimed ground for relief is that the Michigan Court of Appeals unreasonably concluded his trial delay caused no prejudice in violation of his Sixth Amendment right to a speedy trial. Again, we disagree.

The Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" U.S. Const. amend. VI. In *Barker v. Wingo*, the Supreme Court established four factors for evaluating a speedy-trial claim: (1) whether the delay was uncommonly long; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) whether prejudice to the defendant resulted. 407 U.S. 514, 530 (1972). "No one factor is dispositive. Rather, they are related factors that must be considered together with any other relevant circumstances." *United States v. Sutton*, 862 F.3d 547, 559 (6th Cir. 2017).

The Michigan Court of Appeals examined each of these four factors, finding each were either neutral or weighed in one party's favor or the other, as follows:

LENGTH OF DELAY

The time between defendant's arrest (October 29, 2009) and trial was about 21 months. However, the trial court dismissed the charges against defendant on September 9, 2010, and the prosecution did not recharge defendant until November 3, 2010, a time span of 63 days. Absent bad faith by the prosecutor, a delay is not "attributed to either side" when there is no charge pending against defendant. This is true even when the prosecution caused the dismissal by failing to prepare for trial. Thus, for purposes of establishing the burden of proof, the delay between arrest and trial was approximately 19 months. Therefore, the prosecution had the burden to show that defendant was not prejudiced by the delay.

REASON FOR DELAY

* * *

The prosecution is responsible for the majority of the delay between arrest and trial. Most of these delays were caused by inherent delays in the court system, and are only given minimal weight. However, the prosecution is responsible for an almost two-month delay, from September 9 to November 3, 2010, when it dismissed the

charges because it was unprepared to go to trial. Not only is the prosecution charged with the delay between the original trial date and the recharging, but it is also charged with the time the proceedings had to be repeated after the recharging, which was an additional delay of approximately one month.

On the other hand, defendant was responsible for about five months of the delay between his arrest and trial. Before the prosecution dismissed the charges and recharged defendant, defendant filed a motion to quash the information that took a week to resolve. Then on December 15, 2010, defendant filed his motion to dismiss and declined to continue with pretrial proceedings until the court heard his motion. This took over two months to resolve. Defendant is also responsible for a delay of about three months, from April 27, 2011, to the start of trial, when defendant filed, and the trial court granted, an emergency motion to adjourn the date of trial. Therefore, because both sides contributed fairly equally to the delays, this factor does not weigh in either party's favor.

### ASSERTION OF RIGHT

This factor weighs slightly in defendant's favor. Defendant asserted his right to a speedy trial approximately seven and a half months before the trial court held his trial when he filed a motion for dismissal on December 15, 2010.

### PREJUDICE

The prosecution was able to overcome the presumption of prejudice. . . . Here, defendant argues that one of his key witnesses died during the delay. However, as the prosecution correctly points out, defendant did not list that person on his witness list before the first trial. This factor favors the prosecution. After weighing the factors, defendant's argument that the trial court denied him his right to a speedy trial fails. The trial court correctly denied defendant's motion on this issue.

*Bryant*, 2014 WL 4214849, at *7–8 (internal citations omitted).

Given the speedy-trial inquiry's generality, *see Sutton*, 862 F.3d at 559, we cannot conclude that this thorough discussion "was so lacking" as to merit habeas relief, *Harrington*, 562 U.S. at 103. That one of Bryant's potential witnesses—who purportedly would have testified as his landlord about his rental of another apartment, not apartment 13—died during the delay gives us no pause with this conclusion. First, the record supports the Michigan Court of Appeals' statement that Bryant did not list that witness on his original witness list. Second, other witnesses (including Bryant) provided similar testimony. And finally, the district court aptly commented that

"considering the significant evidence against the petitioner in this case, it is not readily apparent how the state court's determination that the absence of [the witness] did not prejudice his case unreasonably applied federal law." *Bryant*, 2019 WL 559674, at *13. Or, in the state's words, "there is no reason to think testimony that Bryant was not on apartment 13's lease would have made a difference. It is perfectly plausible that Bryant could be at apartment 13—even living in apartment 13—without being named on the lease."

The district court therefore correctly concluded Bryant was not entitled to a writ of habeas corpus for his speedy-trial claim.

V.

For these reasons, we affirm the district court's judgment.